IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 23-cv-02348-PAB-STV

BENJAMIN CARTER,

      Plaintiff,

v.

MOUNTAIN VIEW FIRE PROTECTION DISTRICT, and
DAVID BEEBE, in his individual and official capacities,

      Defendants.

---

## ORDER

---

      This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment [Docket No. 68], Defendants' Motion for Summary Judgment [Docket No. 72], and Defendant's Motion to Preclude the Opinions of Plaintiff's Rebuttal Expert William Bryson [Docket No. 69]. Plaintiff Benjamin Carter's motion seeks summary judgment pursuant to Federal Rule of Civil Procedure 56 on the first claim of his complaint. Docket No. 68 at 1. Defendants Mountain View Fire Protection District (the "District") and Chief David Beebe (collectively, "defendants") filed a response. Docket No. 125. Mr. Carter filed a reply. Docket No. 137.

      Defendants' motion seeks summary judgment on all four claims in Mr. Carter's complaint. Docket No. 72 at 1-2. Mr. Carter filed a response. Docket No. 111.[1]

---

[1] Mr. Carter's response states that "Plaintiff waives his state law claim under the Colorado Firefighter Safety Act." Docket No. 111 at 2 n.1. The fourth claim of Mr. Carter's complaint was brought pursuant to the Colorado Firefighter Safety Act, Colo.

Defendants filed a reply.  Docket No. 138.  The Court has jurisdiction pursuant to 28

U.S.C. § 1331.

## I.  UNDISPUTED FACTS[2]

Mr. Carter was hired as a firefighter with the District in 2009.  Docket No. 72 at 3,

¶ 1.  During his employment with the District, Mr. Carter was promoted through the

various firefighter grades to engineer; Chief Beebe promoted him to lieutenant in 2020.

*Id.*, ¶ 2.  Mr. Carter has been a member of Mountain View Professional Firefighters,

Local 3214, International Association of Firefighters (the "Union") since he started

working for the District, including holding a position on its executive board since 2012.

*Id.* at 4, ¶ 6.  On January 1, 2023, Mr. Carter was elected as the Union President.  *Id.*,

¶ 11.

On January 30, 2023, although Mr. Carter was not on duty, he went to District

Fire Station No. 13 to prepare bunker gear for new recruits.  *Id.* at 7, ¶ 28.  While there,

Mr. Carter claims to have learned from a District vendor that one of the new recruits

requested not to have an American flag on his gear.  *Id.*  Mr. Carter went to Captain

Shad Bennet and informed him of what he had learned from the District's vendor related

to the American flag request and that there were no American flags on the District's

personal protective equipment ("PPE").  *Id.*, ¶ 29.[3]  Captain Bennet testified it was his

---

Rev. Stat. § 29-5-204.  *See* Docket No. 1 at 13-14.  The Court will therefore dismiss that
claim with prejudice.

  [2] The following facts are undisputed unless otherwise noted.

  [3] Plaintiff only admits that "Flagg directed Carter to Bennet's office."  Docket No.
111 at 5, ¶ 29.  Plaintiff does not admit or deny anything else.  The Court's practice
standards require a party opposing summary judgment, with respect to each fact which
the opposing party claims to be undisputed, to admit or deny that fact.  Practice
Standards (Civil Cases), Chief Judge Philip A. Brimmer, § III.F.3.b.iv; *see also* Fed. R.
Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of

impression that Mr. Carter was upset, animated, and frustrated about the information he
had received, and he expressed his frustration to Captain Bennet regarding that issue
with the expectation that it be handled immediately.  *Id.*, ¶ 30.

Captain Bennet and Mr. Carter contacted Gina Daly, the District's Human
Resources Assistant, to discuss the new recruit's request and the lack of an American
flag on District's PPE.  *Id.*, ¶ 31.  During the conversation, Mr. Carter told Ms. Daly that
her request to the District's vendor regarding removal of the American flag was against
the District's uniform policy and requested information as to who approved the request.
*Id.*, ¶ 32.  Ms. Daly informed Mr. Carter the new recruit's request concerned an
accommodation, had been taken up the chain of command and approved by the Chief,
and when the recruit was stationed after the academy the appropriate people would be
notified.  *Id.* at 8, ¶ 33.[4]  Ms. Daly found Mr. Carter's conduct during the phone call to
be unnecessarily confrontational, dismissive, and belittling.  *Id.*, ¶ 37.[5]  Mr. Carter
discussed the new recruit's religious accommodation with Battalion Chief Flagg, Mr.
Carter's supervisor, who knew nothing of the request.  *Id.* at 9, ¶ 39.  Mr. Carter did not
seek guidance as to what he could or could not share with other employees regarding
the new recruit's protected class information.  *Id.*  Battalion Chief Flagg found Mr.

---

fact . . . , the court may . . . consider the fact undisputed").  The Court deems this fact to
be admitted.
      [4] Plaintiff disputes this fact, stating that "Carter disputes the accuracy of Daly's
uncorroborated testimony."  Docket No. 111 at 6, ¶ 33.  Mr. Carter does not explain why
Ms. Daly's testimony is inaccurate, and he does not cite evidence that calls into
question her testimony.  The Court therefore deems this fact to be admitted.
      [5] Plaintiff objects to the accuracy of Ms. Daly's testimony, Docket No. 111 at 6,
¶ 37, but he does not explain why Ms. Daly's testimony is inaccurate, and he does not
cite evidence that calls into question her testimony.  The Court deems this fact to be
admitted.

Carter's concerns about the request confusing since the District's PPE did not have American flags at that time.  *Id.*, ¶ 40.

After learning of the new recruit's religious accommodation request, Mr. Carter discussed the request with 14 other District employees.  *Id.*, ¶ 42.  District Management learned of Mr. Carter's discussions related to the new recruit's religious accommodation and obtained information that Mr. Carter's comments had been negative and potentially harassing.  *Id.* at 10, ¶ 44.[6]

### A. Investigation and Discipline Process

On February 6, 2023, a meeting occurred with Deputy Chief Sterling Folden, the Deputy Chief of Operations, Battalion Chief Mike Lee, Battalion Chief Chad Rademacher, and Director of Administrative Services Pam Owens to discuss information that had been learned relating to Mr. Carter's alleged inappropriate discussions about the new recruit's religious accommodation.  *Id.*, ¶ 45.  A decision to initiate an investigation into Mr. Carter's conduct was made at the February 6 meeting. *Id.*, ¶ 46.  After meeting with the Deputy and Battalion Chiefs, Ms. Owens met with Chief Beebe and District HR Manager Melissa Meehan to discuss what had occurred at the meeting.  *Id.*, ¶ 47.

At approximately 9:40 a.m. on February 8, 2023, Chief Beebe and Ms. Owens met with Captain Bennet to obtain information on the January 30 call.  *Id.*, ¶ 48.  It was thereafter decided that Mr. Carter should be placed on paid administrative leave during

---

[6] Plaintiff objects in part, stating that it is disputed whether "the information obtained pointed to the comments being negative and potentially harassing."  Docket No. 111 at 8, ¶ 44.  Mr. Carter does not cite any evidence in support of this position. The Court finds that the evidence cited by defendants supports the asserted fact.  The Court therefore deems this fact to be admitted.

the investigation because of a concern that Mr. Carter would interfere with and impair the investigation if he remained at work.  *Id.*[7]

On February 9, 2023, Deputy Chief Folden called Mr. Carter to advise him that he was being placed on paid administrative leave.  *Id.* at 11, ¶ 50.  Mr. Carter later received the administrative leave letter via email.  *Id.*  Prior to Deputy Chief Folden placing Mr. Carter on administrative leave, Mr. Carter met with Chief Beebe and other District employees to discuss an unrelated grievance the Union had filed.  *Id.*, ¶ 51.  The meeting was contentious.  Docket No. 111 at 13, ¶ 18.[8]  In the days after Mr. Carter was placed on paid administrative leave, he exchanged emails with Ms. Owens regarding his leave and obtained information on the oral report of harassment and discrimination that had been made against him.  Docket No. 72 at 11, ¶ 53.[9]

Chief Beebe appointed Deputy Chief Webb to conduct an internal investigation into the allegations against Mr. Carter.  *Id.*, ¶ 54.  The investigation began on February

---

[7] Plaintiff objects, stating that "[t]he cited evidence does not support that Beebe decided to put Carter on administrative leave on February 8, and ¶ 4 of the Pam Owens declaration is not admissible."  Docket No. 111 at 8, ¶ 48.  One of the cited exhibits, a transcript from Chief Beebe's deposition, does not support the asserted fact.  The Court finds, however, that the declaration of Ms. Owens does support the asserted fact and that plaintiff has failed to provide any support for his argument that her declaration is not admissible.  Although the declaration itself may constitute hearsay, it is not the form of evidence that must be admissible but the substance.  *See Law Co., Inc. v. Mohawk Const. and Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009). The Court therefore deems this fact to be admitted.

[8] Defendants object, disputing whether the meeting was contentious.  Docket No. 138 at 7, ¶ 18.  The exhibit cited by defendants is, however, a portion of the transcript of Chief Beebe's deposition in which Chief Beebe admits he raised his voice at Mr. Carter.  The Court therefore deems this fact to be admitted.

[9] Plaintiff objects, stating that it is disputed whether he "obtained any information about the oral report made against him from this exchange."  Docket No. 111 at 8, ¶ 53.  The Court finds, however, the exhibit cited by both defendants and plaintiff regarding this fact shows that Mr. Carter received some information regarding the oral report made against him.  The Court therefore deems this fact to be admitted.

9, 2023.  *Id.*, ¶ 54.  Chief Beebe appointed Deputy Chief Webb because he believed

that Deputy Chief Webb was the most competent person available internally for the

investigation, could timely complete the investigation, and because the District had

recently had an unsuccessful experience with an outside investigator.  *Id.*, ¶ 55.  As part

of his investigation, Deputy Chief Webb conducted interviews between February 9,

2023 and February 26, 2023.  *Id.* at 12, ¶ 57.

On February 17, 2023, a statement of charges and notice of violation of the

District's rules, regulation, policies, or procedures ("charging document") was prepared

by Deputy Chief Webb and was sent via email to Mr. Carter and by Federal Express to

his residence on February 21, 2023.  *Id.*, ¶ 59.  The charging document described Mr.

Carter's misconduct as follows: insubordination related to Chief Beebe's decision to

grant the new recruit's religious accommodation by questioning the decision and

seeking to undermine it; disseminating confidential information related to the new

recruit's religious accommodation without approval which caused discord amongst staff

and required repair before the new recruit started working; disrespectful attitude and

behaviors with staff related to the religious accommodation which conduct was

consistent with prior unprofessional conduct on which Mr. Carter had been warned; and

falsification of district records related to his work while on vacation.  *Id.*, ¶ 60.  On

February 21, 2023, shortly after receiving the charging document, Mr. Carter emailed

Deputy Chief Webb, Ms. Owens, Chief Beebe, and the District's former HR Manager

and requested to meet with Deputy Chief Webb and also raised several issues he

thought were important.  *Id.* at 13, ¶ 62.

On February 27, 2023, Deputy Chief Webb and Ms. Owens met with Mr. Carter and a Union representative and went over the charging document and an evidence summary that Deputy Chief Webb had prepared. *Id.*, ¶ 64.[10] The evidence summary contained background facts, the charges, and a description of evidence, including names of certain witnesses, and referred to other witnesses, such as employee crews, officers, and female employees. *Id.*, ¶ 65. The evidence summary identified only five witnesses by name: Captain Bennet, Ms. Daly, Battalion Chief Rademacher, Battalion Chief Flagg, and non-employee equipment contractor Jim Geer. Docket No. 68 at 8, ¶ 23.[11] During Mr. Carter's February 27 meeting with Deputy Chief Webb, Mr. Carter made a statement in his defense, mentioned information he contended was important to the charges, and stated his position on the evidence in the evidence summary. Docket No. 72 at 13, ¶ 66.[12] During this meeting, Mr. Carter was not provided with: 1) a complete list of witness identities or their statements, 2) an opportunity to cross-examine any witnesses, 3) representation by legal counsel, and 4) an independent decision-maker. Docket No. 111 at 14, ¶ 25.[13] Deputy Chief Webb did not identify the

---

[10] The parties dispute whether there were one or two Union representatives present at the meeting. *See* Docket No. 111 at 9, ¶ 64; Docket No. 138 at 5, ¶ 64. The Court finds this distinction immaterial and deems this fact as admitted insofar as it asserts that at least one Union representative attended the meeting.

[11] Defendants reply that they "deny those are the only witnesses or witness statements referenced as other witnesses were not identified by name given concerns related to investigation interference and retaliation." Docket No. 125 at 8, ¶ 23. The Court finds this to be nonresponsive and deems this fact to be admitted.

[12] Plaintiff objects, stating that "[t]he lack of information presented to Carter at the February 27 meeting severely compromised Carter's ability to mount a meaningful and effective defense." Docket No. 111 at 9, ¶ 66. The Court finds this argument nonresponsive and deems this fact to be admitted.

[13] Defendants object, stating that they "[d]eny the process [Mr. Carter] received before and after his termination was inconsistent with the [collective bargaining

approximately 25-30 witnesses that he had interviewed for the investigation.  Docket No. 68 at 9, ¶ 27.  Deputy Chief Webb refused to provide answers to Mr. Carter's questions about the content of the charging document and the evidence summary.  *Id.*, ¶ 26.[14]

On March 2, 2023, Mr. Carter submitted a written response to Deputy Chief Webb related to the charging document and the evidence summary.  Docket No. 72 at 13, ¶ 67.[15]  In the response, Mr. Carter stated his disagreement with Deputy Chief Webb's conclusions and his objection that the District had not identified evidence supporting discipline.  Docket No. 68 at 9, ¶ 28.  On March 8, 2023, Deputy Chief Webb provided Chief Beebe with the disciplinary charges against Mr. Carter, the evidence he had obtained during his investigation, Mr. Carter's written statement to the charging document and the evidence summary, and his associated findings that there was sufficient cause and evidence to sustain all of the charges against Mr. Carter.  Docket No. 72 at 14, ¶ 69.[16]  On March 21, 2023, Chief Beebe and Ms. Owens met with Mr. Carter and his Union representative to provide Mr. Carter with a second opportunity to

---

agreement] or [the handbook] or Beebe was biased."  Docket No. 138 at 8, ¶ 25 & 27.  The Court finds this argument nonresponsive and deems this fact to be admitted.

[14] Defendants "[d]eny that the purpose of Plf's meeting with Webb was for Webb to answer questions, as it was an opportunity for Plf to provide Webb factual information he had to rebut the Charges and information in the Evidence Summary consistent with the Handbook and CBA."  Docket No. 125 at 9, ¶ 26.  The Court finds this to be nonresponsive and deems this fact to be admitted.

[15] Plaintiff states that it is "[a]dmitted that Carter submitted a written response based solely on the limited information provided to him in his February 27 meeting with Webb."  Docket No. 111 at 9, ¶ 67.  The Court finds this assertion nonresponsive and deems this fact to be admitted.

[16] Plaintiff objects, stating that "Webb did not find evidence to sustain the charges."  Docket No. 111 at 10, ¶ 69.  The Court finds that defendants have accurately characterized the evidence and that the exhibits cited by plaintiff do not refute defendants' asserted fact.  The Court therefore deems this fact to be admitted.

address the charges against him and the evidence Deputy Chief Webb obtained during his investigation. *Id.*, ¶ 70.[17]  During this meeting, Mr. Carter was not provided with: 1) a complete list of witness identities or their statements, 2) an opportunity to cross-examine any witnesses, 3) representation by legal counsel, or 4) an independent decision-maker. Docket No. 111 at 14, ¶ 25.[18]  Prior to the March 21 meeting, Mr. Carter was provided with Deputy Chief Webb's March 8, 2023 memo to Chief Beebe which described Deputy Chief Webb's findings. Docket No. 72 at 14, ¶ 71. Mr. Carter was given the opportunity to address that document with Chief Beebe. *Id.* During Mr. Carter's meeting with Chief Beebe, he was permitted to provide Chief Beebe with any other evidence or information he thought important, and Chief Beebe asked Mr. Carter specific questions to which Mr. Carter provided additional information. *Id.*, ¶ 72.[19]

After Mr. Carter's meeting with Chief Beebe on March 21, 2023, Chief Beebe issued Mr. Carter a letter, stating in pertinent part that, after considering all of the evidence, including Mr. Carter's oral and written statements, Chief Beebe was terminating Mr. Carter's employment. *Id.*, ¶ 73. As provided in the Employee Handbook ("the handbook") and collective bargaining agreement ("CBA"), Chief Beebe's March 21

---

[17] Plaintiff objects in part, stating that he did not have "a meaningful and full opportunity to address the charges against him or review and address all the evidence from Webb's investigation." Docket No. 111 at 10, ¶ 70. The Court finds this argument nonresponsive and deems this fact to be admitted.

[18] Defendants object, stating that they "[d]eny the process [Mr. Carter] received before and after his termination was inconsistent with the [collective bargaining agreement] or [the handbook] or Beebe was biased." Docket No. 138 at 8, ¶ 25 & 27. The Court finds this argument nonresponsive and deems this fact to be admitted.

[19] Plaintiff objects, stating that he "again repeated in this meeting that he had not received sufficient information to fully understand the charges against him and mount a meaningful defense and could only provide a defense based off the limited documentation and information he had received up to that point." Docket No. 111 at 10, ¶ 72. The Court finds this argument nonresponsive and deems this fact to be admitted.

termination letter advised Mr. Carter that Mr. Carter had the right to appeal the decision
to Chief Beebe provided Mr. Carter had new or additional information to present that
was not previously considered.  *Id.* at 14-15, ¶ 74.  Specifically, the termination letter
stated: "[p]ursuant to Section SF (l)(j) [of the handbook] the Fire Chief's decision is the
final decision for the District for all purposes.  Discipline matters are not appealable to
the Board.  You have the right to appeal the decision to the Fire Chief based on new or
additional information."  Docket No. 68 at 11, ¶ 39.  Chief Beebe would only consider
new or additional evidence in review of the appeal.  Docket No. 125 at 13, ¶ 9.

On April 10, 2023, Mr. Carter's legal counsel submitted a letter to Chief Beebe on
Mr. Carter's behalf appealing Chief Beebe's termination decision.  Docket No. 72 at 15,
¶ 75.  On April 12, 2023, Chief Beebe informed Mr. Carter by letter that he had
considered Mr. Carter's appeal and the information therein, but because it did not
contain any new or additional information, the appeal was denied.  *Id.*, ¶ 76.[20]

### B. <u>Collective Bargaining Agreement</u>

Mr. Carter was the Union's lead negotiator on the CBA that governed at the time
of his separation and was a signatory on behalf of the Union.  *Id.* at 5, ¶ 15.  The CBA's
purpose is to "promote and ensure harmonious relations, cooperation, and
understanding" between the District and Union members and "to provide a workable
process for determining wages and benefits."  *Id.*, ¶ 17.  The CBA states that, if there is
a conflict between it and the District's handbook and/or the District's policies and

---

[20] Plaintiff disputes the assertion that his appeal did not contain new information.
Docket No. 111 at 10, ¶ 76.  The Court finds this argument nonresponsive to the
asserted fact regarding Chief Beebe's stated reason for denying the appeal.  The Court
therefore deems this fact to be admitted.

procedures, the CBA controls. *Id.*, ¶ 18.[21]  The CBA discusses that discharge is to be

for "just cause" and identifies examples of matters for which there is just cause to

discipline employees. *Id.* at 6, ¶ 20.  The CBA directs the reader to the handbook for

more information on just cause and provides examples of disciplinary conduct and a

process the District must follow when terminating an employee. *Id.*, ¶ 21.  The CBA

does not include the right to a post-termination hearing and identifies the Fire Chief as

the final decisionmaker for all purposes. *Id.*, ¶ 23.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A disputed fact is "material" if,

under the relevant substantive law, it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary judgment.

*Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict

for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

---

[21] Plaintiff admits this fact, with the clarification that, "the CBA also contains
Article XXIV, which states that 'If any provision of this Agreement is subsequently
declared by judicial authority to be unlawful, unenforceable, or not in accordance with
applicable laws, statutes, and regulations of the United States of America and the State
of Colorado, all other provisions of this Agreement shall remain in full force."  Docket
No. 111 at 4, ¶ 18.  The Court finds this clarification to be nonresponsive and deems
this fact to be admitted.

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115.

When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* Cross-motions for summary judgment must be viewed separately, and the denial of one does not necessitate the granting of the other. *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (citations omitted).

### III. ANALYSIS

Plaintiff and defendants both moved for summary judgment on plaintiff's procedural due process claim. Docket No. 68 at 1; Docket No. 72 at 1-2. Defendants move for summary judgment on both of plaintiff's First Amendment retaliation claims. Docket No. 72 at 1-2. Chief Beebe raises the defense of qualified immunity. Docket No. 72 at 2; Docket No. 125 at 2. The District asserts that it is not liable as a municipal entity. Docket No. 72 at 38-39; Docket No. 125 at 2.

12

### A. **Procedural Due Process**

Mr. Carter's due process claim, brought pursuant to 42 U.S.C. § 1983, alleges a violation of his right to procedural due process under the Fourteenth Amendment. Docket No. 1 at 8-10, ¶¶ 39-49.  The Fourteenth Amendments protects against the deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "[P]rocedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision."  *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 490 (10th Cir. 1991).  Courts engage in a two-step analysis to determine whether a plaintiff was denied procedural due process, asking "(1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?"  *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998).  The Court will analyze Mr. Carter's claims under both of these steps.

### 1. *Property Interest*

"The Supreme Court has stated that property interests are not created by the Constitution, but by existing rules or understandings that stem from independent sources, 'such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Darr v. Town of Telluride*, 495 F.3d 1243, 1251 (10th Cir. 2007) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "State law sources for property interests can include statutes, municipal charters or ordinances, and express or implied contracts."  *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1128 (10th Cir. 2001) (citing *Carnes v. Parker*, 922 F.2d 1506, 1509 (10th Cir. 1991)).  For employment actions, the question is whether the "plaintiff has a legitimate expectation of continued employment."  *Hennigh*, 155 F.3d at 1253 (citation

13

omitted).  Such expectations may arise from an employee having tenure, a contract for

a fixed term, an implied promise of continued employment, or if state law allows

dismissal only for cause or its equivalent.  *Darr*, 495 F.3d at 1251 (citations omitted).

Procedural protections alone are insufficient to establish a protected property

interest.  *Kingsford*, 247 F.3d at 1129.  Instead, there must be a substantive restriction

on the employer's discretion to terminate the employee, such as a requirement that the

adverse action may only be imposed for cause.  *Id.*; *see also Asbill v. Hous. Auth.*, 726

F.2d 1499, 1502 (10th Cir. 1984) ("if a statute  . . . specifies the grounds on which an

employee may be discharged, or restricts the reasons for discharge to 'just cause

shown,' then the employee has a right to continued employment until such grounds or

causes are shown.").

The parties dispute whether the CBA between the District and the Union creates

the kind of substantive restriction on the District's ability to terminate Mr. Carter that

would give him a protected property interest for purposes of the Fourteenth Amendment

analysis.  *See* Docket No. 68 at 14-15; Docket No. 72 at 16-18.  The CBA requires "just

cause" for termination of a Union member.  Docket No. 72 at 6, ¶ 20.  The CBA states

that the handbook contains more details on the definition of just cause, *id.*, ¶ 21, but, in

fact, it does not contain any such details.  *See* Docket No. 72 at 18.[22]  Defendants

argue that the lack of a definition in the handbook renders the "just cause" provision of

the CBA overly vague and therefore unenforceable.  *Id.*  The Court disagrees.  In

assessing an undefined term in a contract, a court should "focus on the words employed

---

[22] What the handbook does or does not say regarding "just cause" is not included
in defendants' undisputed material facts.

14

and construe any undefined words in harmony with the[ir] plain and generally accepted meaning . . . and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter." *Sch. Dist. No. 1 in Cnty. of Denver v. Denver Classroom Teachers Ass'n*, 433 P.3d 38, 41 (Colo. 2019) (citation and internal quotations omitted). For this interpretation, a court may "consult definitions in recognized dictionaries to give undefined words their plain and generally accepted meaning." *Id.* Black's Law Dictionary states:

> good cause (16c) A legally sufficient reason. Good cause is often the burden placed on a litigant (usu. by court rule or order) to show why a request should be granted or an action excused. *The term is often used in employment-termination cases.* Also termed good cause shown; *just cause*; lawful cause; sufficient cause.

*Cause*, Black's Law Dictionary (12th ed. 2024) (emphasis added); *see also Cause*, Merriam Webster, https://www.merriam-webster.com/dictionary/cause (last visited September 23, 2025) ("just cause: cause that a person of ordinary intelligence would consider a fair and reasonable justification for an act – used especially in cases involving termination of employment"). The Court finds that the term "just cause" had a commonly understood meaning in the employment context and that the CBA is not void for vagueness or ambiguity. The Court also finds that, as a matter of law, there was a substantive restriction on the District's ability to terminate Mr. Carter's employment. Thus, Mr. Carter had a protected property interest in his continued employment and was entitled to the protections of the procedural due process clause.

### 2. *Process Due*

"Once a protected property interest is established, the question then becomes what level of process is appropriate. In general, a post-termination hearing is required." *Copelin-Brown v. New Mexico State Pers. Off.*, 399 F.3d 1248, 1255 (10th Cir. 2005)

(citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546-47 (1985)).  The post-

termination hearing typically entails "more formal due process protections."  *Powell v.*

*Mikulecky*, 891 F. 2d 1454, 1458 (10th Cir. 1989).  "Although a post-termination hearing

need not replicate a judicial hearing, the terminated employee should have the right to

representation by an attorney and a chance to call witnesses, introduce other evidence

on his behalf, and cross-examine adverse witnesses."  *Denne v. Salt Lake City*, 2025

WL 2374355, at *4 (D. Utah Aug. 14, 2025).  "The pretermination and post-termination

processes work hand in hand, so courts 'must evaluate the constitutionality of [either

one] in light of the [other].'"  *Id*. (citing *Benavidez v. City of Albuquerque*, 101 F.3d 620,

626 (10th Cir. 1996)).

In order to determine what process Mr. Carter was due, it is necessary to

determine what process the District afforded him in connection with his termination.

The Court will first examine the post-termination process.  The CBA provisions

regarding the employee discipline process provide that the appeal of a termination is

limited to "appealing a termination decision to [Chief] Beebe, who would only consider

new or additional evidence in review of the appeal."  Docket No. 125 at 13, ¶ 9.  Chief

Beebe sent Mr. Carter a termination letter on March 21, 2023.  Docket No. 72 at 14,

¶ 73.  In that letter, Chief Beebe stated, "[p]ursuant to Section SF (l)(j) [of the handbook]

the Fire Chief's decision is the final decision for the District for all purposes.  Discipline

matters are not appealable to the Board.  You have the right to appeal the decision to

the Fire Chief based on new or additional information."  Docket No. 68 at 11, ¶ 39.  On

April 10, 2023, Mr. Carter's legal counsel submitted a letter to Chief Beebe on Mr.

Carter's behalf appealing Chief Beebe's termination decision.  Docket No. 72 at 15,

¶ 75.  On April 12, 2023, Chief Beebe informed Mr. Carter by letter that he had

considered Mr. Carter's appeal and the information therein and that, because the

appeal did not contain any new or additional information, the appeal was denied.  *Id.*,

¶ 76.  Thus, the District provided Mr. Carter with the following post-termination process:

A written appeal to the person who made the termination decision, limited to "new or

additional information."  The due process he received did not include "more formal due

process protections," *Denne*, 2025 WL 2374355, at *4 (quoting *Powell*, 891 F.2d at

1458), such as a hearing giving him the chance to call witnesses, introduce other

evidence on his behalf, cross-examine adverse witnesses, and be represented by an

attorney.

   The Court now examines whether the pre-termination procedures provided Mr.

Carter with the process he was due.  The purpose of this review is to determine

whether, in light of the minimal post-termination process the District gave Mr. Carter, the

pre-termination process afforded him constitutionally sufficient rights.  "To evaluate the

constitutionality of post-termination process, we must view it in light of the pre-

termination procedures it follows."  *Copelin-Brown*, 399 F.3d at 1255.  Here, given the

minimal post-termination process that plaintiff received, the procedures in the pre-

termination process become much more important.  *See Denne*, 2025 WL 2374355, at

*4 ("Pretermination and post-termination processes work hand in hand").

   The District afforded the following pre-termination process to Mr. Carter: On

February 9, 2023, Deputy Chief Folden called Mr. Carter to advise him that the District

was placing him on paid administrative leave.  Docket No. 72 at 11, ¶ 50.  The District

later emailed an administrative leave letter to Mr. Carter.  *Id.*  In the days after Mr.

Carter was placed on paid administrative leave, he exchanged emails with the Director of Administrative Services, Ms. Owens, regarding his leave.  *Id.* at 10-11, ¶¶ 45, 53.  Through these emails, Mr. Carter obtained information on the oral report of harassment and discrimination that had been made against him.  *Id.* at 11, ¶ 53.  On February 17, 2023, Deputy Chief Webb prepared the charging document.  *Id.* at 12, ¶ 59.  On February 21, 2023, the District sent the charging document to Mr. Carter via email and Federal Express.  *Id.*  The charging document described Mr. Carter's misconduct as

> insubordination related to Beebe's decision to grant the new recruit's religious accommodation by questioning the decision and seeking to undermine it; disseminating confidential information related to the new recruit's religious accommodation without approval which caused discord amongst staff and required repair before the new recruit started working; disrespectful attitude and behaviors with staff related to the religious accommodation which conduct was consistent with prior unprofessional conduct on which Mr. Carter had been warned; and falsification of district records related to his work while on vacation.

*Id.*, ¶ 60.  The charging document also provided Mr. Carter with the District rules, regulations, policies, and procedures that Mr. Carter was alleged to have violated, stated that the alleged conduct began on January 30, 2023, and included "to the extent practicable . . . detail as to the gender of witnesses and other details as to the allegations comprising the charges."  *Id.*, ¶ 61.

On February 21, 2023, after Mr. Carter received the charging document, he emailed Deputy Chief Webb and other District officials to request a meeting with Deputy Chief Webb.  *Id.* at 13, ¶ 62.[23]  On February 27, 2023, Deputy Chief Webb and Ms. Owens met with Mr. Carter and his Union representative.  *Id.*, ¶ 64.  At the meeting, Mr.

---

[23] The employee handbook states that an employee facing discipline should, within five business days of being presented with the charges, contact the relevant disciplining officer or supervisor to schedule a meeting regarding the charges.  *See* Docket No. 72-11 at 34.

Carter was given an evidence summary prepared by Deputy Chief Webb.  *Id.*  The

evidence summary identified only five witnesses by name, Docket No. 68 at 8, ¶ 23,

despite the fact that Deputy Chief Webb had interviewed 25-30 witnesses.  *Id.* at 9,

¶ 27.  The evidence summary provided excerpts from statements by other employees,

but it did not identify those employees by name.  *Id.*, ¶ 24.   At the meeting, Deputy

Chief Webb refused to answer any of Mr. Carter's questions regarding the content of

the charging document and the evidence summary.  *Id.*, ¶ 26.

After the meeting with Deputy Chief Webb, Mr. Carter submitted a written

response to the evidence summary in which he expressed his disagreement with the

charges and complained about the District's failure to identify evidence supporting

discipline.  *Id.*, ¶ 28.[24]  Deputy Chief Webb then sent his findings, along with the

charging document, evidence summary, and Mr. Carter's written response, to Chief

Beebe.  Docket No. 72 at 14, ¶ 69.  Mr. Carter also received this set of documents.  *Id.*,

¶ 71.  Neither party asserts that Mr. Carter received any other information from the

District.  On March 21, 2023, Mr. Carter, along with his Union representative, had a

meeting with Chief Beebe.  *Id.*, ¶ 70.[25]

In terms of pre-termination process that Mr. Carter received, Chief Beebe gave

him notice of the charges, provided three opportunities for him to make a statement (the

February 27 meeting with Deputy Chief Webb, the March 2 written response to the

---

[24] The employee handbook states that the employee facing discipline should
submit a written response within five business days of being presented with the
charges.  *See* Docket No. 72-11 at 34.
[25] The employee handbook states that the employee facing discipline should
schedule a meeting with the fire chief to discuss the charges.  *See* Docket No. 72-11 at
34.

charging document and evidence summary, and the March 21 meeting with Chief

Beebe), and provided him the opportunity to submit materials to the District.  As a result,

Chief Beebe afforded Mr. Carter "oral or written notice of the charges against him, an

explanation of the employer's evidence, and an opportunity to present his side of the

story." *Loudermill*, 470 U.S. at 546.  Typically, this would satisfy the requirements of

due process.  But the Supreme Court in *Loudermill* conditioned its holding as to the

sufficiency of those pre-termination rights on the fact that the plaintiff in that case was

allowed a "full post-termination hearing."  *Id*. ("Our holding rests in part on the provisions

in Ohio law for a full post-termination hearing.").  As already discussed, Chief Beebe

provided Mr. Carter with no meaningful post-termination process.

      "To evaluate the constitutionality of the post-termination process, we must view it

in light of the pre-termination procedures it follows.  Where, as here, the pre-termination

process offers minimal opportunity for the employee to present her side of the case, the

procedures in the post-termination hearing become much more important."  *Copelin-*

*Brown*, 399 F.3d at 1255 (citing *Benavidez*, 101 F.3d at 626).  In *Copelin-Brown*, the

court found that the plaintiff "was afforded no post-termination hearing or opportunity to

appeal the . . . decision to terminate her.  Accordingly, the district court was correct in

finding that the lack of procedural due process violated Ms. Copelin-Brown's

constitutional rights."  *Id*.  At the point he was terminated, Mr. Carter had been given the

names of only five of the 25-30 witnesses interviewed by Deputy Chief Webb.  Thus, his

ability to perform his own investigation of the charges was constrained.  For example,

he was accused of having a disrespectful attitude with staff, but Chief Beebe only gave

Mr. Carter the name of Ms. Daly, did not provide him with names of other staff that he

was rude to, and did not identify how he was disrespectful or rude to the unnamed staff. This lack of information limited Mr. Carter's ability to fully respond to the charges.

More fundamentally, by not affording Mr. Carter a hearing, Chief Beebe deprived Mr. Carter of the ability to "challenge the employer's action," *id*. (quoting *Benavidez*, 101 F.3d at 626), so that Mr. Carter could "discover whether the reasons for [his] discharge are true – or are false and a mere subterfuge." *Id*. (quoting *Goudeau v. Indep. Sch. Dist. No. 37 of Okla. Cnty., Okla.*, 823 F.2d 1429, 1431 (10th Cir. 1987)). The importance of a hearing is again illustrated by Ms. Daly. The summary indicated that Mr. Carter was rude to Ms. Daly and that Ms. Daly told Mr. Carter the information regarding the religious accommodation was confidential. Mr. Carter denied both allegations. However, unless he had the opportunity to cross-examine Ms. Daly, his denial was simply that, a denial without the means to test Ms. Daly's credibility.

The Court concludes that the undisputed facts show that the totality of the process that Chief Beebe afforded to Mr. Carter in connection with his termination violated his constitutional rights.[26] Mr. Carter was entitled to a list of witnesses and a

---

[26] The Tenth Circuit and other courts have held that the provisions of a collective-bargaining agreement, such as a union grievance procedure, can sometimes satisfy an employee's procedural due process rights. *See Hennigh*, 155 F.3d at 1256 (collecting cases); *Rivera v. Bernalillo Cnty.*, 51 F. App'x 828, 832 (10th Cir. 2002) (unpublished) ("As long as the procedural requirements are reasonable and give the aggrieved party adequate notice and an opportunity to meaningfully participate, they are not unconstitutional."). In those cases, however, unlike this one, the union grievance procedures provided for post-termination process. *See Hennigh*, 155 F.3d at 1256; *Rivera*, 51 F. App'x at 832. Moreover, the fact that the CBA identifies the fire chief as the final decisionmaker regarding termination, *see* Docket No. 72 at 6, ¶ 23, does not constitute a waiver of Mr. Carter's due process rights given that, regardless of whether the chief was or was not the final decisionmaker, the CBA does not purport to waive a union member's due process rights in regard to discipline or termination and, in any event, are not reasonable.

hearing at which he had the ability to call witnesses on his behalf, call adverse witnesses in order to cross-examine them, and be represented by an attorney. Thus, Mr. Carter is entitled to summary judgment on his due process claim, and that part of the defendants' summary judgment will be denied.

Mr. Carter asserts that Chief Beebe was biased because 1) Chief Beebe had some involvement in the investigation, 2) Chief Beebe and Mr. Carter had a contentious meeting regarding a union issue on the same day Mr. Carter was placed under investigation, and 3) Chief Beebe "unreasonabl[y] refus[ed] to consider any mitigating circumstances in connection with the decision to terminate, not least of which is Carter's discipline free work record." Docket No. 68 at 20-21 (emphasis omitted).

"Impartiality of the tribunal is an essential element of due process." *Riggins v. Goodman*, 572 F.3d 1101, 1112 (2009) (citing *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975)). However, "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal." *Corstvet v. Boger*, 757 F.2d 223, 229 (10th Cir. 1985). The decisionmaker is entitled to a "a presumption of honesty and integrity." *Riggins*, 572 F.3d at 1112. "Due process is violated only when 'the risk of unfairness is intolerably high' . . . . [T]here must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." *Hicks v. City of Watonga*, 942 F.2d 737, 746–47 (10th Cir. 1991) (internal quotations omitted).

Even if Chief Beebe had some involvement in the investigation, that does not, without more, demonstrate bias. *See Riggins*, 572 F.3d at 1112 ("In many small public agencies human resource personnel wear multiple hats. Thus, the contention that the

combination of investigative and adjudicative functions necessarily creates an

unconstitutional risk of bias in administrative adjudication has a . . . difficult burden of

persuasion to carry.") (internal quotations and citation omitted).  The Court finds that Mr.

Carter has failed to satisfy the "difficult burden" described in *Riggins*.  *Id.*

The fact that Mr. Carter and Chief Beebe had a contentious meeting on February

9, 2023 regarding a union issue does not demonstrate bias.  "Personal bias may be

shown by prior statements going to the merits or animus that establish the

decisionmaker cannot be fair."  *Id.* at 1113.  In *McClure v. Ind. Sch. Dist. No. 16*, 228

F.3d 1205, 1215–16 (10th Cir. 2000), the court found several school board members

were biased against the plaintiff because they stated, prior to the termination hearing,

that they intended to terminate the plaintiff's employment.  In *Staton v. Mayes*, 552 F.2d

908, 914 (10th Cir. 1977), school board members made similar statements to those in

*McClure*, and the Tenth Circuit held that "statements on the merits by those who must

make factual determinations on contested fact issues of alleged incompetence and

willful neglect of duty, where the fact finding is critical . . . left no room for a

determination that there was a decision by a fair tribunal, with the appearance of

fairness."

In *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 484

(1976), teachers had gone on strike as part of a labor dispute with the local school

board.  The school board held a termination hearing and fired the teachers for striking in

violation of Wisconsin law.  *Id.* at 485.  The teachers sued, arguing that the school

board members were biased and therefore the teachers' due process right to a neutral

arbiter had been violated.  *Id.* at 485-86.  Specifically, the teachers argued that 1) the

board members had been involved in the union contract negotiations that had preceded

the strike, and 2) the board members had, as the Supreme Court described the

argument, "manifested some personal bitterness toward the teachers, aroused by

teacher criticism of the Board during the strike." *Id.* at 491-92. The Supreme Court held

that neither of these claims was sufficient to show bias that implicated procedural due

process rights. *Id.* at 491-93. Instead, the Supreme Court explained that the teachers

had not shown that the board members had the kind of "personal or financial stake in

the decision that might create a conflict of interest, and there is nothing in the record to

support charges of personal animosity." *Id.*

The Court finds that the fact that Mr. Carter and Chief Beebe had been involved

in a dispute over an issue unrelated to Mr. Carter's conduct or to the events that formed

the stated basis for his termination is insufficient to raise an issue as to whether Chief

Beebe was biased. There is no record of Chief Beebe making statements before the

termination hearing about his intent to terminate Mr. Carter, and Mr. Carter does not

identify any personal animus any greater than the apparent animus that existed in

*Hortonville* as a result of the teachers' criticism of board members.[27]

Third, Mr. Carter complains that Chief Beebe refused to consider "any mitigating

circumstances in connection with the decision to terminate, not least of which is Carter's

discipline free work record." Docket No. 68 at 21 (emphasis omitted). Mr. Carter does

not identify any authority for the proposition that Chief Beebe was required to consider

---

[27] Mr. Carter's response asserts several facts indicating that Chief Beebe had previously demonstrated some animus toward Mr. Carter. *See* Docket No. 111 at 12, ¶¶ 7-9, 10-11. The Court finds the asserted facts to be an inaccurate characterization of prior statements by Chief Beebe and that no reasonable juror could infer the requisite animus here.

as "mitigating evidence" background facts, such as a prior employment record, that are unrelated to the facts that serve as the basis for termination, and the Court is not aware of any such authority.  The Court therefore finds that Mr. Carter's arguments about Chief Beebe's supposed bias do not weigh in favor of summary judgment to plaintiff.[28]

### 3. Qualified Immunity

Chief Beebe invoked the defense of qualified immunity.  Docket No. 125 at 2. "When a defendant raises the qualified-immunity defense, the onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (internal citations and quotations omitted). The Court may address the two prongs in either order.  *Id.*  As discussed above, the Court has found that Chief Beebe deprived Mr. Carter of his constitutional right to procedural due process.  Thus, the Court must consider whether the relevant law was clearly established as of the time of the termination process in February and March 2023.  *See Surat v. Klamser*, 52 F.4th 1261, 1270-71 (10th Cir. 2022)

A constitutional right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Surat*, 52 F.4th at 1276.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the

---

[28] To the extent that Mr. Carter complains, as part of his bias argument, that his rights were violated because Chief Beebe served as the initial decisionmaker on Mr. Carter's termination and decided the appeal of that decision, the Court rejects that argument.  *See Hicks*, 942 F.2d at 748 (explaining, in a case where the plaintiff asserted a violation of right based on the fact that some of the same people served on both the second and third levels of the termination review process, that "the Supreme Court has held that involvement of tribunal members in earlier proceedings in the same case does not overcome the presumption of honesty and integrity.").

clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Torres v. Madrid*, 60 F.4th 596, 603 (10th Cir. 2023); *see also Irizarry v. Yehia*, 38 F.4th 1282, 1293 (10th Cir. 2022).

First, the Court has found that Mr. Carter had a property interest in continued employment with the District. Longstanding Tenth Circuit precedent clearly establishes that an employee subject to a "just cause" termination requirement has a property interest in continued employment. *See, e.g., Asbill*, 726 F.2d at 1502. Thus, the Court finds that it is clearly established that Mr. Carter had a property interest in continued employment given the "just cause" employment protection he had.

Second, the Court has found that Chief Beebe violated Mr. Carter's due process rights by failing to provide him with adequate due process in connection with his termination. "[T]he law has been established for thirty years; the Due Process Clause requires the state to provide an opportunity for a hearing whenever a permanent state employee is terminated." *Copelin-Brown*, 399 F.3d at 1256. Thus, it is clearly established that Mr. Carter was entitled to a hearing. Tenth Circuit cases have held that the adequacy of the pre- and post-termination processes are evaluated in light of each other, *see, e.g.*, *Copelin-Brown*, 399 F.3d at 1255; *Benavidez*, 101 F.3d at 626, making it clearly established that, if an employer fails to provide the adequate due process protections post-termination, the employer needs to provide those protections pre-termination, and vice-versa. The Court finds that it was clearly established that the totality of process that Chief Beebe afforded to Mr. Carter in connection with his termination violated Mr. Carter's constitutional rights.

The Court therefore finds that Chief Beebe is not entitled to qualified immunity on this claim and will grant summary judgment in favor of Mr. Carter. The Court will deny the portion of Docket No. 72 in which Chief Beebe seeks summary judgment on the due process claim.

### 4. Municipal Liability

To bring a claim for municipal liability under § 1983 for the actions of municipal employees, a plaintiff must demonstrate 1) that a municipal employee committed a constitutional violation and 2) that a municipal policy or custom was the moving force behind the deprivation of rights. *See Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). A municipal policy or custom can take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Mr. Carter argues that Chief Beebe is the final decisionmaker for the District on employment matters and that Chief Beebe's decision to terminate Mr. Carter without due process therefore falls within the definition of a municipal policy or custom. Docket No. 68 at 26-27. Defendants argue that the fact that Chief Beebe is the final decisionmaker on personnel matters does not make him the final decisionmaker for purposes of municipal liability. Docket No. 125 at 32-33. Defendants argue this is so because the chief is required to follow the discipline process outlined in the handbook, which is in turn dictated by the District's board. *Id.* The Court rejects this argument. In

determining who the final decisionmaker is for purposes of municipal liability, the Court looks to state and local laws and regulations to determine who has been granted policymaking authority by a legislative enactment or some other method of delegation. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)).  Defendants' argument, as the Court understands it, would lead to the conclusion that the final decisionmaker for the purposes of municipal liability is the person or entity who empowered the official to make the final decision that is being challenged.  That argument is contrary to the holding of *Praprotnik*.  The Tenth Circuit held in *Randle v. City of Aurora*, 69 F.3d 444, 450 (10th Cir. 1995), that, "[i]f the City officials are final policymakers in the area of personnel policy (i.e. are authorized to make final employment decisions as to wages, promotions, hiring and termination), the City can be held liable for any impermissible employment decisions under §§ 1981 and 1983."  The undisputed facts show that Chief Beebe was authorized by the District's board of directors to make final, unreviewable termination decisions.  Docket No. 68 at 3, ¶ 3.  Thus, under the holding of *Randle*, Chief Beebe acted as a final policymaker when he made the decision to terminate Mr. Carter.  *See* 69 F.3d at 450.  Since Chief Beebe made a decision as a final policymaker, his decision constituted municipal policy.  *See Bryson*, 627 F.3d at 788.  Thus, the Court finds that the District may be held liable under a theory of municipal liability.  *See Jiron*, 392 F.3d at 419.  The Court will grant summary judgment in favor of Mr. Carter on his due process claim against the District based on *Monell* liability.  The Court will deny the portion of Docket No. 72 in which the District seeks summary judgment on this claim.

### 5. Punitive Damages

Mr. Carter's complaint seeks punitive damages to "redress the knowing, willful, wanton, reckless, and bad faith nature of Plaintiff's Constitutional rights." Docket No. 1 at 16. Defendants' motion for summary judgment argues that punitive damages are not available because 1) a plaintiff may not seek punitive damages against a municipality under 42 U.S.C. § 1983 and 2) Chief Beebe did not act with the kind of "evil motive or intent" or with "reckless or callous indifference" to a federally protected right. Docket No. 72 at 39. Mr. Carter's response concedes that punitive damages are not available against the District as a municipality. Docket No. 111 at 37. Mr. Carter maintains, however, that punitive damages are available against Chief Beebe. *Id.* at 39-40.

Punitive damages are only available in a Section 1983 action when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003) (citing *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992)); *see also Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir. 1976) ("A jury may properly find that such conduct by a public official manifests a reckless indifference to the property rights of others, ill will, a desire to injure or malice. Punitive damages are recoverable in a section 1983 action provided such aggravating circumstances are found."). To obtain punitive damages, Mr. Carter must prove by a preponderance of the evidence that Chief Beebe acted with evil motive or with callous indifference to his constitutional rights. *See Rossiter v. Robinson*, 716 F. Supp. 2d 1018, 1027 (D. Colo. 2010) (citing *Smith v. Wade*, 461 U.S. 30, 51 (1983)). The Court finds that it is premature to decide the issue of punitive damages against Chief Beebe at the summary judgment phase. *See Cadena v. Rock Ridge Ins. Co.*,

29

2025 WL 1426565, at *6 (W.D. Okla. May 16, 2025) ("the recoverability of punitive

damages in this action is best resolved at trial with the benefit of a complete record")

(internal quotation omitted); *Garner v. CUSA PRTS, L.L.C.*, 2006 WL 8433302, at *2 (D.

Wyo. Mar. 31, 2006) ("This Court, in its discretion, generally does not grant motions for

summary judgment on punitive damages because a legal determination on this subject

is better made after the evidence has been heard.").

Mr. Carter's complaint requests that he be reinstated to his former position.

Docket No. 1 at 16. Mr. Carter mentions that request at the end of his summary

judgment motion. *See* Docket No. 68 at 28-29. Defendants contest whether

reinstatement is an appropriate remedy. Docket No. 125 at 35-36. The Court will not

reach that issue at this time. Mr. Carter sought summary judgment on liability only. *See*

Docket No. 68 at 1. The Court will order the parties to provide additional briefing on the

issues of damages and remedies. The briefs should address what entitlement, if any,

Mr. Carter has to either reinstatement or a renewed termination proceeding, as well as

what damages he is entitled to. The briefs should also address whether the parties will

try the issue of damages to a jury or to the Court and whether there are issues for which

there is no right to a trial by jury.

### B. Retaliation for Exercise of First Amendment Speech[29]

Defendants move for summary judgment on Mr. Carter's claim alleging that

defendants retaliated against him for exercising his First Amendments right to freedom

of speech. Docket No. 72 at 25-31. Mr. Carter claims that defendants retaliated against

---

[29] The heading of Mr. Carter's second claim alleges retaliation based on both
speech and assembly rights. *See* Docket No. 1 at 10. However, the Court does not
understand either the complaint or the briefing to raise a freedom of assembly claim.

him for speaking out on three occasions by terminating his employment.  Docket No.
111 at 19-21.

"[P]ublic employees do not surrender *all* their First Amendment rights by reason
of their employment."  *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting
*Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).  Rather, "the First Amendment protects
a public employee's right . . . to speak as a citizen addressing matters of public
concern."  *Id*. (quoting *Garcetti*, 547 U.S. at 417).  "The government employer, however,
also has a 'countervailing interest in controlling the operation of its workplaces.'"  *Id*.
(quoting *Lane v. Franks*, 573 U.S. 228, 236 (2014)).  "The problem in any case is to
arrive at a balance between the interests of the employee, as a citizen, in commenting
upon matters of public concern and the interest of the State, as an employer, in
promoting the efficiency of the public services it performs through its employees."  *Id*.
(quoting *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568
(1968) (internal alterations omitted)).

"In striking this balance, the First Amendment prohibits public employers from
taking adverse action against employees because of their protected speech."  *Id*. at
945.  "To determine if an employer's adverse employment action against an employee
is an impermissible retaliation under the First Amendment, [courts] apply the
*Garcetti/Pickering* test."  *Id*. (citing *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir.
2014); *Garcetti*, 547 U.S. at 421; *Pickering*, 391 U.S. at 568)); *see also Joritz v. Gray-
Little*, 822 F. App'x 731, 738 (10th Cir. 2020) (unpublished); *Kennedy v. Bremerton Sch.
Dist.*, 142 S. Ct. 2407, 2424 (2022.  The *Garcetti/Pickering* test has five elements:

1.  The protected speech was not made pursuant to an employee's official
    duties.

31

2. The protected speech addressed a matter of public concern.

3. The government's interests as an employer did not outweigh the employee's free-speech interests.

4. The protected speech was a motivating factor in the adverse employment action.

5. The defendant would not have made the same employment decision in the absence of the protected speech.

*Lincoln v. Maketa*, 880 F.3d 533, 538 (10th Cir. 2018) (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)); *see also Joritz*, 822 F. App'x at 738; *Knopf*, 884 F.3d at 945; *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1221 (10th Cir. 2017). "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury." *Knopf*, 884 F.3d at 945 (quoting *Trant*, 754 F.3d at 1165).

Mr. Carter identifies three instances of protected speech that he believes served as the basis for retaliation by defendants. Docket No. 111 at 19-21.

### *1. 2023 Accommodation Speech*

The first instance of speech is what the Court will refer to as the "2023 accommodation speech." This speech involves Mr. Carter's discussion of the lack of flags on District uniforms and the fact that a recruit had requested a religious accommodation related to flags on uniforms. Docket No. 72 at 7, 9, ¶¶ 29, 31, 32, 39, 42. The Court will divide this speech into two groups: the speech that occurred on January 30, 2023 between Mr. Carter and Ms. Daly, Captain Bennet, and Battalion Chief Flagg (the "January 30th conversations"), and Mr. Carter's speech that took place over the following week in conversations between Mr. Carter and various other District employees (the "February conversations").

32

Defendants argue both instances of the 2023 accommodation speech occurred as part of Mr. Carter's official duties and did not touch on a matter of public concern. *Id.* at 27.

### a. Official Duties

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Lincoln*, 880 F.3d at 538 (quoting *Garcetti*, 547 U.S. at 421). The Tenth Circuit has "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Knopf*, 884 F.3d at 945 (quoting *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010)). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* (quoting *Lane*, 573 U.S. at 240). "If the speech involves 'the type of activities that the employee was paid to do,' then it falls within the scope of an employee's duties." *Id.* (internal alterations omitted) (quoting *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 800-01 (10th Cir. 2007)). However, "[m]erely because an employee's speech was made at work and about work does not necessarily remove that employee's speech from the ambit of constitutional protection." *Wright v. Kay Cnty. Just. Facilities Auth.*, 2023 WL 2822122, at *5 (10th Cir. Apr. 7, 2023) (unpublished) (quoting *Thomas v. City of Blanchard*, 548 F.3d 1317, 1323 (10th Cir. 2008)).

There are no "bright line rules" in determining whether speech falls within the scope of an employee's duties. *Knopf*, 884 F.3d at 945 (citation omitted). Courts can consider several relevant, non-dispositive factors, including the tasks in an employee's job description, the frequency an employee performs a task, the subject of the

33

employee's speech, the recipient of the employee's speech, and the legal obligation for
the employee to speak. *Id*. at 945–46 (citing *Brammer-Hoelter v. Twin Peaks Charter
Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007) (job description is not dispositive); *Holub v.
Gdowski*, 802 F.3d 1149, 1156 (10th Cir. 2015) (frequency of performance is not
dispositive); *Lane*, 573 U.S. at 239 (speech made about work is not dispositive)).
Courts must "take a practical view of all the facts and circumstances surrounding the
speech and the employment relationship." *Id*. at 946 (citation omitted). "Ultimately,
[courts] ask whether the employee was performing the task they were paid to perform
when they spoke." *Id*. (internal alterations, quotations, and citation omitted). If so, the
"speech was therefore commissioned by his employer," and the speech "enjoys no First
Amendment protection." *Id*. (citation omitted).

Defendants argue that the 2023 accommodation speech was made pursuant to
Mr. Carter's duties as assistant quartermaster and is thus speech made pursuant to
official duties. Docket No. 72 at 27. Defendants further note that the undisputed facts
show that the Union would have no reason to be involved in an accommodation issue
like this one, and thus that Mr. Carter cannot claim that he was speaking in his union
role rather than his District role. *Id.* at 27-28. Mr. Carter does not directly respond to
this argument, stating only, "[i]n January 2023, Carter's first month as President of the
Local Union, Carter spoke with several coworkers about the uniform policy and how the
District would accommodate the new employee. . . . While this speech was more of a
convenient excuse for Beebe to terminate Carter than its moving cause, it was

34

nevertheless protected speech about a matter of public concern."  Docket No. 111 at
21.[30]

The Court finds that the January 30th conversations among Mr. Carter, Ms. Daly,
Captain Bennet, and Battalion Chief Flagg regarding flags on the uniforms and
accommodation requests constituted speech made pursuant to official duties.  On
January 30th, on his day off, Mr. Carter went to work to prepare bunker gear for new
recruits.  Docket No. 72 at 7, ¶ 28.  As part of that work, he learned from an equipment
vendor that there had been an accommodation request regarding flags on the uniforms.
*Id.*  Mr. Carter then raised concerns regarding the uniforms and the accommodation
through the chain of command by speaking with Captain Bennet and Battalion Chief
Flagg.  *Id.* at 7, 9, ¶¶ 29, 31, 32, 39.  The Court finds that, because Mr. Carter's speech
occurred while at work, regarded an issue related to his work, and took place among
people within his chain of command, the January 30th conversations constituted official
speech.  *See Reinhardt v. Albuqerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1135-36
(10th Cir. 2010).  Mr. Carter has failed to raise a genuine dispute of material fact that
would show that these conversations were not speech pursuant to Mr. Carter's district
duties.  The Court finds that Mr. Carter's January 30th conversations regarding the
uniforms and accommodation are not subject to First Amendment protection.

---

[30] The Court notes that this statement arguably concedes that plaintiff cannot
meet the fourth element of *Garcetti*/*Pickering* regarding this speech.  However, the
Court will not analyze the matter further because, as the Court will explain, it finds that a
retaliation claim based on this speech is foreclosed by the fact that it was made, at least
in part, pursuant to Mr. Carter's official duties and that it did not touch on a matter of
public concern.

Less clear is whether Mr. Carter's February conversations with various other firefighters regarding the uniforms and the accommodation request could be considered speech pursuant to plaintiff's official duties.  Defendants argue that the speech involved District-related matters, were with District employees, and "mostly occurred while performing District work."  Docket No. 72 at 27.  But the fact that the speech was "made at work and about work does not necessarily remove that employee's speech from the ambit of constitutional protection."  *Wright*, 2023 WL 2822122, at *5.  The Court does not need to resolve this issue, however, because, as the Court will explain below, the discussions regarding uniforms and religion accommodations did not touch on a matter of public concern.

### b.  Matter of Public Concern

"Matters of public concern are those of interest to the community, whether for social, political, or other reasons."  *Joritz*, 822 F. App'x at 738 (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012)).  "Speech that pertains to a public agency's discharging its governmental responsibilities ordinarily will be regarded as speech on a matter of public concern."  *Id*. (quoting *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996)).  However, "speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern."  *Id*. (quoting *David*, 101 F.3d at 1355).  In distinguishing between these two types of speech, the Tenth Circuit directs courts to "consider the speaker's motivation: Was the speech calculated to redress personal grievances or did it have some broader public purpose?"  *Id*. (quoting *Eisenhour v. Weber Cnty*., 744 F.3d 1220, 1228 (10th Cir. 2014)).  Courts should examine "the content, form, and context of a given statement, as revealed by the whole record."  *Id*. (quoting *Morris*, 666 F.3d at

661).  When examining the context and form of the speech, courts must determine

whether the "employee's *primary* purpose was to raise a matter of public concern."

*Rogers v. Riggs*, 71 F.4th 1256, 1261–62 (10th Cir. 2023) (quoting *Singh v. Cordle*, 936

F.3d 1022, 1035 (10th Cir. 2019)).

As to the 2023 accommodation speech,[31] Mr. Carter states only that he "spoke

on matters of public concern when discussing with coworkers his desire to ensure the

accommodation of the new hire."  Docket No. 111 at 22.[32]  Mr. Carter also cites an

asserted dispute of material fact, which states that Mr. Carter engaged in conversations

regarding the accommodation request as part of his role as president of the Union in

order to ensure the recruit "fit in and had a positive transition to employment at the

District."  *Id.* at 16.  Defendants correctly note that speech does not touch on a matter of

public concern merely because it is union related.  *See* Docket No. 72 at 28 (citing

*Torres v. Pueblo Bd. of Cnty. Comm'rs*, 229 F.3d 1165, 2000 WL 1346347 (10th Cir.

Sept. 19, 2000)).  Mr. Carter's assertion regarding the purpose behind his speech, if

accepted as true, would demonstrate that the primary purpose of the speech was to

make the recruit feel welcome at the District, not to raise a matter of public concern.

*Rogers*, 71 F.4th at 1261-62.  Moreover, the Court finds that the presence or absence of

a flag on a uniform and the religious beliefs of a given firefighter are not matters of

public interest to the community for any social, political, or other reason.  Instead, the

Court finds these issues to fit squarely within the category of internal personnel matters

---

[31] Mr. Carter's response on the 2023 accommodation speech does not draw any distinction among the various conversations he had.  *See* Docket No. 111 at 22.

[32] This portion of Mr. Carter's response does not discuss the 2023 grievance meeting speech.

that are not of public concern.  *See Joritz*, 822 F. App'x at 738.  Thus, the Court finds

that Mr. Carter's 2023 accommodation speech, both as it occurred in the January 30th

conversations and in the February conversations, did not involve a matter of public

concern and is therefore not entitled to the protection of the First Amendment.  The

Court therefore finds that Mr. Carter has failed to raise a genuine dispute of material fact

as to this element and has failed to demonstrate retaliation based on his 2023

accommodation speech.[33]

### 2.  *2020 Speech*

The second instance of speech will be referred to as the "2020 speech."  In 2020,

as part of his role as a Union representative on the District's Labor-Management

Committee, Mr. Carter made an accusation that Assistant Chief Long was improperly

using District maintenance facilities to perform work on a personal vehicle.  Docket No.

111 at 12, ¶ 7.  Mr. Carter claims that Chief Beebe delayed his promotion in 2020 as a

result of making the accusation against Assistant Chief Long and that defendants used

Mr. Carter's accusation about Assistant Chief Long to retaliate against him in 2023 by

terminating him.  *Id.* at 24-25.

Defendants' reply argues that plaintiff cannot rely on the 2020 speech to defeat

summary judgment because that speech was not asserted as a basis for the claim in

---

[33] The portion of Mr. Carter's response addressing the free speech issue does
not discuss his speech in the February 9, 2023 grievance meeting with Chief Beebe as
a basis for retaliation, despite the fact that he has alleged retaliation for that meeting in
other places.  *See, e.g.*, Docket No. 111 at 32.  The Court notes that, to the extent Mr.
Carter claims retaliation for speech made in the grievance meeting, the Court finds that
this speech was not a matter of public concern because it involved internal matters
regarding use of a particular employment form.  *See* Docket No. 72 at 29-30; *see also
id.* at 11, ¶ 51 (citing Docket No. 73 at 9-11, 84:19-86:3 (explaining that the grievance
related to a "corrective action form").

the complaint.  Docket No. 138 at 14.[34]  The Court finds, however, that the complaint

adequately puts defendants on notice of the 2020 speech being a part of Mr. Carter's

free speech retaliation claim.  In the general allegations section of the complaint, Mr.

Carter asserts that, "[i]n or around October 2019, Defendant Beebe delayed Plaintiff

Carter's promotion to Lieutenant because of Carter's having reported a violation of

District policy in his capacity as a Union representative."  Docket No. 1 at 3, ¶ 11.  While

it appears that the complaint is mistaken and that the alleged delay in promotion

occurred in 2020, the details otherwise match.  *Compare id.*, *with* Docket No. 111 at 12,

¶ 7.  The free speech retaliation claim alleges that "Carter actively spoke out on matters

of public concern, including . . . statements made to ensure that District policies were

followed."  Docket No. 1 at 10, ¶ 53.  The 2020 speech concerns District policies.  The

Court therefore finds that the complaint adequately alleges the 2020 speech as being

part of plaintiff's second claim.

Defendants argue, however, that Mr. Carter cannot demonstrate that this speech

served as a motivating factor for his termination.  Docket No. 138 at 16-17.[35]

---

[34] Defendants also argue that any retaliation claim for that speech is time barred.
Docket No. 138 at 14.  Defendants, however, do not cite any authority for the
proposition that a First Amendment retaliation claim's statute of limitations depends on
the date of the speech rather than the date of the retaliatory action; precedent dictates
otherwise.  *See McDonald v. Sch. Dist. No. 1 in the Cnty. of Denver & Colorado*, 83 F.
Supp. 3d 1134, 1143 (D. Colo. 2015) ("In the First Amendment retaliation context, a
claim accrues 'when the plaintiff knows or has reason to know of the injury that is the
basis for the action.'") (quoting *Mata v. Anderson,* 635 F.3d 1250, 1252 (10th Cir.
2011)).  Thus, defendants cannot preclude consideration of plaintiff's 2020 speech on
the basis that it is untimely.

[35] Defendants' reply argues that the speech identified by Mr. Carter in his
response fails on all five elements of *Garcetti/Pickering*.  Docket No. 138 at 14-17.  The
Court finds that the 2020 speech constituted a matter of public concern because it
disclosed "evidence of corruption, impropriety, or other malfeasance on the part of city
officials."  *See Deutsch v. Jordan*, 618 F.3d 1093, 1100 (10th Cir. 2010) (internal

The fourth element of the *Garcetti/Pickering* analysis considers whether "[t]he protected speech was a motivating factor in the adverse employment action." *Lincoln*, 880 F.3d at 538. "Under the fourth-prong of *Garcetti,* plaintiffs bear the burden of establishing both a detrimental employment decision (adverse employment action) and 'causation – that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment.'" *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1236 (10th Cir. 2009) (citing *Maestas v. Segura,* 416 F.3d 1182, 1188 & n.5 (10th Cir. 2005)). "What constitutes a substantial motivating factor evades precise definition." *Maestas*, 416 F.3d at 1188. An employee "need not prove that [her] speech was the sole reason for defendants' action." *Copp v. Unified Sch. Dist. No. 501,* 882 F.2d 1547, 1553 (10th Cir. 1989). "Nor is the employee required to show 'but-for' causation; that is, to demonstrate but-for the employee's speech the subsequent employment action would not have occurred." *Maestas*, 416 F.3d at 1188 (citing *Spiegla v. Hull,* 371 F.3d 928, 941–43 (7th Cir. 2004)). "Rather, the employee must show the protected speech played a substantial part in the employer's decision to adversely alter the employee's conditions of employment." *Id.* (emphasis omitted).

Although "protected conduct closely followed by adverse action may justify an inference of retaliatory motive, the mere temporal proximity of Plaintiff's protected speech to the adverse action is insufficient, without more, to establish retaliatory motive." *Couch*, 587 F.3d at 1236 (quoting *Baca v. Sklar,* 398 F.3d 1210, 1221 (10th

---

quotation omitted). The Court also finds that, because Mr. Carter raised this speech as part of his union role on the Labor-Management Committee, it was not made pursuant to his official duties. *See Reinhardt*, 595 F.3d at 1135-36.

Cir. 2005)).  "It might be relevant in establishing a retaliatory motive that 'the employer

expressed opposition to the employee's speech,' . . . or that 'the protected speech

implicated the individual defendant in wrongdoing.'"  *Id.* (quoting *Maestas,* 416 F.3d at

1189; *Baca,* 398 F.3d at 1221).  However, "evidence such as a long delay between the

employee's speech and challenged conduct, or evidence of intervening events, tend to

undermine any inference of retaliatory motive and weaken the causal link."  *Id.* (quoting

*Maestas,* 416 F.3d at 1189).  "Although causation is ordinarily a factual question in this

context, 'summary judgment is appropriate when there simply is no evidence in the

record from which a trier of fact could reasonably conclude the protected speech was a

motivating factor' in the challenged action."  *AH Aero Servs., LLC v. Heber City*, 601 F.

Supp. 3d 1157, 1184 (D. Utah 2022) (quoting *Cypert v. Indep. Sch. Dist. No. I-050 of

Osage Cnty.*, 661 F.3d 477, 484 (10th Cir. 2011)).

Mr. Carter makes three arguments as to why there is sufficient evidence for him

to survive summary judgment on this element.  Docket No. 111 at 23-29.  First, he

argues that defendants have a history of anti-speech actions taken against him and that

those anti-speech actions have extended to his termination.  *Id.* at 24-25.  Second, he

argues that there is temporal proximity between his speech and the adverse actions.  *Id.*

at 25-26.  Third, he argues that the reasons for his termination were pretextual, as

proved by the lack of inherent merit of the allegations as well as the nature of the

investigation and the fact that other potentially culpable people were not disciplined

similarly.  *Id.* at 29.

The Court finds that no reasonable juror could conclude that plaintiff's 2020

speech was a motivating factor for his termination.  First, there is no temporal proximity

between plaintiff's 2020 speech and his 2023 termination.  Mr. Carter frames the

temporal proximity analysis between the time of the speech and the promotion delay,

rather than between the time of the speech and his termination.  *See* Docket No. 111 at

25.  The analysis must focus, however, on the temporal proximity between the speech

and the challenged adverse action.  *See Maestas*, 416 F.3d at 1189.  The adverse

action must "closely" follow the speech.  *See Couch*, 587 F.3d at 1236.  Here, roughly

two and half years passed between the 2020 speech and plaintiff's termination in the

spring of 2023.  Docket No. 72 at 14, ¶ 73; Docket No. 111 at 12, ¶ 7.  Thus, the Court

finds that Mr. Carter's temporal proximity argument cannot create a genuine dispute of

fact regarding this element.

Second, Mr. Carter cannot demonstrate that Chief Beebe exhibited animus

regarding Mr. Carter's prior speech.  Mr. Carter argues that Chief Beebe demonstrated

animus by delaying Mr. Carter's promotion based on his speech, offering the disputed

fact that "Beebe delayed Carter's promotion to Lieutenant because he did not approve

that Carter raised a concern at a Labor-Management Committee meeting and requested

a District investigation into Assistant Chief Keith Long's use of District facilities for

maintenance of personal vehicles."  Docket No. 111 at 12, ¶ 7.  The Court finds this to

be an inaccurate characterization of the exhibits cited by Mr. Carter.  The evidence cited

by Mr. Carter comes from Mr. Carter's recording of a conversation between Chief

Beebe and Mr. Carter.  Docket No. 111-2.  In that conversation, Chief Beebe explains

that his concern about Mr. Carter's accusation against Assistant Chief Long was that

Mr. Carter had circumvented the chain of command for reporting the issue, and Chief

Beebe wants to know whether, if Mr. Carter were to be promoted to an officer position,

he would adhere to the chain of command. *See id.* at 8-9 (transcript 14:6-15:12), 14-15 (transcript 25:18-26:1). Even construing this evidence in the light most favorable to Mr. Carter, the Court finds that no reasonable juror could infer retaliation based on speech from this part of the recording.

Mr. Carter also argues that Chief Beebe demonstrated animus in the recording toward Mr. Carter based on the disputed fact that "Beebe stated that he believed that Carter was 'targeting' Long, and Beebe made clear to Carter that he was also being targeted." Docket No. 111 at 12, ¶ 10. It is ambiguous as to whether Chief Beebe says that he was targeting Mr. Carter. Even viewed in a light most favorable to Mr. Carter, it is not clear from the transcript whether Chief Beebe is targeting Mr. Carter or if Chief Beebe is merely telling Mr. Carter that someone was targeting him. *See* Docket No. 111-2 at 12-13. The Court finds that this evidence is insufficient to raise a genuine dispute of material fact on the issue of animus.

Third, the Court finds that Mr. Carter fails to create an inference that the 2023 investigation and termination were retaliation against him for speech made several years earlier. The fact that Mr. Carter was promoted to lieutenant after his 2020 speech undermines his retaliation argument. As courts have found in employment discrimination cases, promotions are typically inconsistent with an inference of animus. *See McDonald-Cuba v. Santa Fe Protective Servs., Inc.*, 2010 WL 11496952, at *11 (D.N.M. June 4, 2010) (describing as "absurd" an argument that the plaintiff's post-complaint promotion evidenced disparate treatment), *aff'd in part, vacated in part, remanded*, 644 F.3d 1096, 1105 (10th Cir. 2011) ("We need not go [as far as characterizing the argument as "absurd"]. We will simply note that we fail to see how a

promotion based on a complaint of discrimination, even if provided grudgingly, meets

[plaintiff's] burden to establish that [defendant's] asserted reasons for firing her were

pretextual."); *see also Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1062 (5th Cir.

1998) (affirming a grant of summary judgment and stating that, "[W]e conclude that

[plaintiff] failed to produce sufficient evidence to raise a reasonable inference of age

discrimination.  We also observe that weighing against a finding of age discrimination is

the fact that [defendant] hired [plaintiff] at age 50, promoted him at age 52, and then

promoted him once again at age 54."); *Farmer v. Sysco Food Servs. of Conn., LLC*,

2010 WL 3926081, at *6 (D. Conn. Sept. 28, 2010) (granting summary judgment and

finding that "the fact that [plaintiff] was terminated by the same person who had

promoted him twice weighs against an inference of discrimination") (citing *Grady v.

Affiliated Cent.*, 130 F.3d 553, 560 (2d Cir. 1997)); *Charles v. Nike, Inc.*, 2005 WL

8177655, at *9 (N.D. Cal. Dec. 22, 2005), *aff'd*, 255 F. App'x 127 (9th Cir. 2007).  The

Court therefore finds that Mr. Carter has failed to raise a genuine dispute of material fact

as to this element and that he cannot demonstrate retaliation based on his 2020

speech.

### 3. 2019 Procurement Committee Speech

The third instance of speech raised by Mr. Carter is what the Court will refer to as

the "2019 procurement committee speech."  In 2019, Mr. Carter served on a

procurement committee that was advising the District on the process of acquiring new

fire trucks.  Docket No. 111 at 11, ¶ 5.  While on the committee, Mr. Carter made

several assertions regarding the appropriateness of the vehicles under consideration

and suggested that improper motives might be involved in the purchasing decision.  *Id.*

Mr. Carter claims that the warning he received for those statements, *id.*, ¶ 6, constituted

retaliation by District leadership for exercising his free speech rights and that animus from that incident was used to terminate him.  *See id.* at 24-25.

Defendants challenge this assertion as being outside the scope of the complaint. Docket No. 138 at 14.[36]  The Court agrees.  The 2019 procurement committee speech is not referenced in the complaint.  A party may not raise matters beyond the scope of the complaint in response to a motion for summary judgment because defendants have not had fair notice of that claim.  *Shyers v. Metro. Prop. & Cas. Ins. Co.*, 2025 WL 2088721, at *8 (10th Cir. July 25, 2025) ("Although parties can refer to facts only found in discovery to show material factual disputes sufficient to preclude summary judgment, due process and notice-pleading principles require they not alter radically the factual basis of their complaint at summary judgment by introducing a new factual basis not previously presented in the pleadings for a claim.") (internal quotations, alterations, and citation omitted).  As defendants lacked fair notice of the fact that Mr. Carter would claim that his 2019 procurement committee speech resulted in termination, Mr. Carter cannot raise that issue here.

The Court has found that Mr. Carter cannot demonstrate retaliation based on any of the three instances of speech he identifies.  The Court will therefore grant defendants' motion for summary judgment on the second count of Mr. Carter's complaint.[37]

---

[36] As with the 2020 speech, defendants argue that this claim is time-barred. Docket No. 138 at 14.  For the same reasons discussed above, the Court rejects this argument.

[37] As the Court finds that no constitutional violation occurred, it does not reach the "clearly established" prong of Chief Beebe's qualified immunity defense to this claim. Without an underlying constitutional violation, municipal liability cannot apply to the

**C. Retaliation for Exercise of First Amendment Association Rights**

Mr. Carter alleges that he was terminated in retaliation for exercising his First

Amendment right to free association by participating in union activities.  Docket No. 1 at

12-13, ¶¶ 59-67.

The Supreme Court recognizes the "constitutionally protected 'freedom of

association' in two distinct senses."  *Roberts v. United States Jaycees,* 468 U.S. 609,

617 (1984).  The freedom of "intrinsic" or "intimate" association protects "certain intimate

human relationships" while the freedom of "expressive" or "instrumental" association

protects the "right to associate for the purpose of engaging in those activities protected

by the First Amendment."  *Id.* at 617-618; *see also Merrifield v. Bd. of Cnty. Comm'rs,*

654 F.3d 1073, 1080 (10th Cir. 2011) ("the two senses are sometimes labeled as the

'intrinsic' sense, which relates to certain intimate human interactions, and the

'instrumental' sense, which relates to associations necessary to engage in the

enumerated First Amendment rights.").  Regarding instrumental or expressive

association, the Supreme Court has held that "implicit in the right to engage in activities

protected by the First Amendment [is] a corresponding right to associate with others in

pursuit of a wide variety of political, social, economic, educational, religious, and cultural

ends," explaining that "[a]n individual's freedom" to engage in First Amendment

activities requires "a correlative freedom to engage in group effort toward those ends."

*Roberts*, 468 U.S. at 622.  A government actor unconstitutionally infringes upon the

freedom of association if it "impos[es] penalties or withhold[s] benefits from individuals

because of their membership in a disfavored group."  *Id.* (citing *Healy v. James*, 408

District.  *See Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City of
Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

U.S. 169, 180-84 (1972) (holding that college's denial of recognition to students seeking
to form a local chapter of Students for a Democratic Society implicated the students'
First Amendment associational rights)).

The Tenth Circuit has held that, because "[t]here is no 'generalized right of free
association,'" a plaintiff alleging interference with his First Amendment associational
rights must allege that the defendant's interference with association "intruded on
another constitutional right." *Dillon v. Twin Peaks Charter Academy,* 406 F. App'x 253,
259-60 (10th Cir. 2010) (unpublished). In keeping with this principle, the Tenth Circuit
analyzes First Amendment retaliation claims based on instrumental association
"according to the First Amendment conduct the associational conduct promotes."
*Harrison v. Bd. of Cnty. Comm'rs of Cnty. of Larimer*, No. 11-cv-03407-MSK-KMT, 2013
WL 950785, at *12 (D. Colo. Mar. 12, 2013) (citing *Merrifield*, 654 F.3d at 1083).

Here, plaintiff claims retaliation based on his involvement in a public-employee
labor union. Docket No. 1 at 12, ¶ 62. In this context, the Tenth Circuit has held that
plaintiff's claim is governed by the first, fourth, and fifth prongs of the *Garcetti*/*Pickering*
analysis. *See Denton v. Yancey*, 661 F. App'x 933, 938 (10th Cir. 2016) (unpublished);
*Merrifield*, 654 F.3d at 1084 ("in the specific context of public-employee labor unions, we
have 'rejected the requirement that a worker demonstrate that his association with the
union be a matter of public concern.'") (quoting *Shrum v. City of Coweta*, 449 F.3d
1132, 1138 (10th Cir. 2006)).

Mr. Carter's response focuses on events that he argues satisfy the fourth
element of the *Garcetti*/*Pickering* framework. Docket No. 111 at 31-33. Defendants
argue that Mr. Carter has not provided any competent evidence for his argument that

his union activities were a motivating factor behind his termination.  Docket No. 138 at 17-19.

First, Mr. Carter raises the issue of his delayed promotion in 2020 as evidence of retaliation.  Docket No. 111 at 34.  As the Court explained earlier, the events surrounding Mr. Carter's 2020 speech and the associated delay in promotion fail to raise a genuine issue of disputed fact regarding Chief Beebe's motivation.

Second, Mr. Carter references the contentious meeting he had with Chief Beebe on February 9, 2023 regarding Union-related issues.  *Id.* at 35.  The fact that the two men had a contentious meeting does not create an issue of material fact regarding Chief Beebe's motive given that the undisputed facts show that the decision to investigate Mr. Carter and place him on administrative leave had been made prior to that meeting.  *See* Docket No. 72 at 10, ¶¶ 45-48; *cf. Sabourin v. Univ. of Utah*, 676 F.3d 950, 958-59 (10th Cir. 2012) (affirming a grant of summary judgment in favor of the employer on a retaliation claim under the Family and Medical Leave Act ("FMLA") when the employer had decided to terminate the plaintiff prior to learning that the plaintiff planned to take leave under FMLA).  Mr. Carter does not argue, and there is no basis to find, that the subject matter of the investigation – whether plaintiff had disclosed confidential information and been insubordinate – was an improper basis for investigation by the District.

Third, Mr. Carter references a conversation he had with Battalion Chief Rademacher in September 2022 that he argues serves as evidence of retaliatory motive.  Docket No. 111 at 34-35.  The undisputed facts show that Battalion Chief Rademacher and Mr. Carter had a conversation in a District parking lot regarding

overtime policies.  *Id.* at 12-13, ¶ 13.  During this conversation, Battalion Chief

Rademacher "warned Carter to be 'careful on how you approach the confrontational

conversations, because it can be a simple conversation or it can go down a different

path, and that different path won't end up good for you.'"  *Id.*  Mr. Carter then notes that

Battalion Chief Rademacher participated in conversations regarding the need to

investigate Mr. Carter.  *Id.* at 34-35.  The undisputed fact regarding the September 2022

conversation supports that Battalion Chief Rademacher took issue with Mr. Carter's

approach to the conversation, but not that he had an issue with Mr. Carter's

participation in the Union.  *See id.* at 12-13, ¶ 13 (Battalion Chief Rademacher telling

Mr. Carter to be "careful on how you approach confrontational conversations.").

Moreover, even if Battalion Chief Rademacher did harbor some anti-union basis against

Mr. Carter, there is no evidence that Battalion Chief Rademacher was involved in the

decision to place Mr. Carter on administrative leave or to terminate him.  The Court

finds that no reasonable juror could find a retaliatory pretext based on an allegation that

someone not involved in the termination decision disliked Mr. Carter.

Fourth, Mr. Carter cites statements made after his termination to support Chief

Beebe having an anti-union bias before the termination.  *Id.* at 35-36.  Mr. Carter points

to a statement by Chief Beebe that Union members were less forthcoming in the

investigation than other witnesses.  *Id.* at 35 (citing Docket No. 111 at 14, ¶ 23).

However, as Mr. Carter acknowledges, Mr. Carter advised Union members of their

*Weingarten* rights should they be interviewed as part of the investigation into Mr. Carter.

Docket No.111 at 8, ¶ 56; *see Am. Fed. of Gov't Emps., Local 1592 v. Fed. Labor

Relations Auth.*, 836 F.3d 1291, 1296 (10th Cir. 2016) (explaining that the right to have

a Union representative present during employee disciplinary investigations was recognized in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975)).  Thus, Chief Beebe's observation about the willingness of Union members to participate in an investigation that could implicate the members in misconduct does not raise a genuine dispute of material fact regarding Chief Beebe having animus against Union members.  Mr. Carter also mentions the fact that, after Mr. Carter's termination, Chief Beebe spoke with some members of the Union board.  Docket No. 111 at 35.  It is unclear how conversations between Chief Beebe and members of the Union board that occurred after Mr. Carter's termination are relevant to Chief Beebe's motivation before plaintiff's termination, especially given a lack of support for Chief Beebe's anti-Union bias before the termination.

Mr. Carter points to statements made by Chief Beebe about Mr. Carter being a "crusader" or using the union as a weapon.  *Id.*  The disputed fact offered in support of these assertions by Mr. Carter, *id.* at 12, ¶ 11, cites to Docket No. 113 at 10-12 (transcript 28:14-19), which is a deposition of Chief Beebe.  The Court finds that it is not clear from these portions of the deposition transcript that Chief Beebe expressed an anti-union bias and therefore they do not raise a disputed issue of material fact regarding Chief Beebe's bias.

Finally, Mr. Carter argues that Chief Beebe's anti-union animus is shown by the fact that Chief Beebe did not consider Mr. Carter's employment history as a mitigating factor in the termination decision.  Docket No. 111 at 35-36.  As the Court explained in regard to the due process claim, it is unclear what obligation, if any, a disciplining official has to consider background history that is not related to the substance of the claim.

The Court finds that Mr. Carter has failed to raise a genuine dispute of material fact regarding his claim for retaliation based on First Amendment-protected association.[38]  The Court will therefore grant defendants' motion for summary judgment on the third count of Mr. Carter's complaint.

There is a pending motion filed by defendants to exclude expert testimony pursuant to Federal Rule of Evidence 702.  Docket No. 69.  The Court will grant summary judgment on each of the claims in this case.  The only remaining proceedings will relate to the issues of remedies and damages.  The opinions contained in the expert report that defendants seek to strike are not relevant to those issues.  *See* generally Docket No. 69-1.  The Court will therefore deny that motion as moot.

## IV.  CONCLUSION

It is therefore

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 72] is **GRANTED in part and DENIED in part**.  It is further

**ORDERED** that plaintiff's second, third, and fourth claims are **DISMISSED with prejudice**.  It is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Docket No. 68] is **GRANTED**.  It is further

**ORDERED** that plaintiff shall file a brief not to exceed 10 pages on or before **October 14, 2025**, defendants shall file a brief not to exceed 10 pages on or before **October 28, 2025**, and plaintiff may file a reply brief not to exceed 5 pages on or before

---

[38] As the Court finds that no constitutional violation occurred, it does not reach the "clearly established" prong of Chief Beebe's qualified immunity defense as to this claim.  Without an underlying constitutional violation, municipal liability cannot apply to the District.  *See Hinton*, 997 F.2d at 782.

**November 4, 2025** discussing the issues referred to on page 30 of this order.  It is further

       **ORDERED** that Defendant's Motion to Preclude the Opinions of Plaintiff's Rebuttal Expert William Bryson [Docket No. 69] is **DENIED as moot**.

       DATED September 30, 2025.

                BY THE COURT:

                _____
                PHILIP A. BRIMMER
                Chief United States District Judge